POLHEMUS CUMMINS

*v.*

EDWARD G. BULGIN et al.

1. To warrant a court of equity in exercising its power to reform written instruments, on the ground of mistake, the proof, in demonstration of mistake, must be clear and satisfactory.

2. A mistake, in a legal sense, is the doing of an act under an erroneous conviction, which act, but for such conviction, would not have been done.

On final hearing on bill and answer and proofs taken in open court.

*Mr. Elwood C. Harris,* for complainant.

Cummins v. Bulgin.

*Mr. James M. Robeson,* for defendants.

VAN FLEET, V. C.

This suit is brought to reform a mining lease. Reformation is asked on the ground of mistake. The power of a court of equity to reform deeds and other writings for the correction of mistakes stands among its most ancient and useful powers. To warrant its exercise, however, the proof in demonstration of mistake must be clear and satisfactory, such as produces a strong conviction of its truth. That which is written will not be changed on loose, doubtful or equivocal evidence. A mistake, in a legal sense, may be defined to be the doing of an act under an erroneous conviction, which act, but for such conviction, would not have been done.

The lease in question bears date August 26th, 1881, and was executed by the complainant, as lessor, and by Edwin G. Bulgin and George G. Bulgin, who were then copartners, in their partnership name, and by Aurelius J. Swayze, as lessees. The lessees subsequently assigned their rights to Ario Pardee, subject, however, to his right to re-assign to them on three months' notice. The lease grants a term of twenty-one years, and gives the lessees the right to erect and remove buildings and machinery, to make roads and to dig and remove minerals; the lessees covenant to commence mining within ten days, to pay fifty cents a ton on each gross ton of merchantable ore mined the first year, and after the first year to mine and raise two thousand gross tons each year, or pay for the same at the rate of fifty cents a ton. The mistake which the complainant seeks to correct, is found in the description of the land covered by the lease. The description, up to and embracing the error, is in these words:

"Beginning at a point in Andrew J. Cummins's and Scranton's line, at a point on the north side of the public road, on the south side of the great meadows, and known as the Hopkins Mine Hole, on said Cummins's, and runs, first, by said Cummins's line southeasterly, to the north edge of said Cummins's timber land; thence, a northeasterly course, along said timber land, to a point where a line running parallel to the first line will strike a black cherry tree, on the north side of said road and about one hundred feet southwesterly from said Cummins's barn."

The first line given, the one running from the Hopkins Mine Hole to the north edge of Cummins's timber land, although described as running but a single course—southeasterly—and should, therefore, in the absence of other indication of intention, be understood to require a straight line, is, in fact, a broken line with three angles. It runs, first, southerly, then easterly, then southeasterly, and lastly, southerly.

Now, the third line, the one extending from a point along Cummins's timber land to the black cherry tree, is, according to the words of the description, to be run parallel to this broken line. To do this, it is necessary to extend the second line, the one along the timber land, more than twice as far as would be required to reach the cherry tree by a straight line. The area of the tract demised is thus very greatly enlarged. The complainant says that the line to the cherry tree was to be straight; that the line along the timber land was to be extended to a point opposite the cherry tree, and then to run straight to that tree. As the description now stands, it is obvious that if it is possible to run the third line so as to make it parallel to the broken line, the lease will embrace a much larger quantity of land than the complainant intended it should, if it be true that he intended, at the time the contract was made, that the line from the timber land to the cherry tree should be a straight line.

There can be little doubt, under the evidence, that such was the complainant's intention, and that the person who negotiated the lease on the part of the lessees so understood at the time the contract was made. The negotiations on the part of the lessees were conducted by Mr. Edward G. Bulgin. It is not disputed that Mr. Bulgin understood that the complainant would not lease his whole farm. It was, therefore, of the first importance, as an initial step in the negotiations, to have a clear understanding where the line should run separating the part he intended to lease from the part he intended to retain. It is scarcely possible to believe that any sensible person would conclude a bargain of this kind without a distinct understanding upon that subject. The lessees had agreed to pay a fixed sum on a certain number of tons of ore annually, whether they raised that quantity or

Cummins *v.* Bulgin.

not; ordinary prudence would, therefore, it would seem, have restrained them from making such an agreement until the boundaries of the land from which they should have a right to take the ore, had been clearly defined and finally agreed upon. The complainant swears that he pointed out to Mr. Bulgin, on the day the lease was executed, and before they went to the scrivener's to have the lease drawn, where the line would run, that he directed his attention to a dead chestnut tree up in the woods, and stated to him that the line would run from near that tree to the black cherry tree. Mr. Bulgin, on his cross-examination, testified on this point as follows:

"*Q.* Did not you understand from Mr. Cummins that the line ran from the tree straight up to the woods? *A.* No, sir. *Q.* You did not? *A.* No, sir; he may have told me where he thought it would run; I would not say but what he did; probably he has—yes, sir; but then I did not understand it so by the lease. *Q.* Did he ever point out a chestnut tree that he thought the line would run somewhere near? *A.* Afterwards he did; I think he did; a dead tree; I don't think anything was said before that."

It is impossible not to understand this evidence as containing a plain admission, made too, manifestly, after the witness had had a pretty severe struggle with his conscience, that the complainant had told him where the line should run. Now, where did the complainant say it should run? The complainant has told us, and has also mentioned the monuments he designated. Now, what has Mr. Bulgin done? He has denied that the complainant designated the monuments he said he did, but he has not told us where the complainant said the line should run, or what the complainant said when he told him where he thought the line would run. The matter then stands in this wise: the line was agreed upon; nobody pretends that it was the line now claimed by the defendants; so far as appears, that line was never thought of by either of the parties; the complainant says he pointed out a line; Mr. Bulgin admits that he did; the complainant tells where that line runs, but on that point Mr. Bulgin says nothing. Now, with the proofs in this condition, it would seem to be very clear that the line designated by the complainant must be taken as the line agreed upon by the parties.

The complainant mainly furnished the information from which the scrivener drew the description. He says, in giving the description, when he reached the point where the line was to be extended from the timber land to the cherry tree, he stopped and stated that that point could be designated by a stake, or as being near a chestnut tree, and then said that the line should run from that point straight down to the cherry tree. His evidence that he mentioned the chestnut tree as being near the point where the third line should commence, is corroborated by that of his son, and also by that of a third person, who was present, and who is unconnected, in any way, with either of the parties, and, so far as appears, without the least motive to either color or misrepresent the facts. The scrivener and Mr. Bulgin, on the other hand, say that nothing was said about a chestnut tree in the woods, nor that the line should run straight from a point near that tree to the cherry tree. The scrivener, however, admits that he suggested the use of the word " parallel." He says:

"After writing up the description along the woods, I asked the complainant about the point—we had no point designated—and there was something said by me about running a parallel line with the first line, and he assented."

Now, what did the complainant say when asked about the point to which the second line should be extended? He certainly answered that question. There can be no doubt that the third line had been agreed upon, or its location so nearly defined that the parties knew about where it would run. Three of the five persons present say that he mentioned a chestnut tree as being near the point; the other two say he did not—at least they have no recollection of it. This being the condition of the evidence on this point, and the truth of the statement of the three being strongly corroborated by the inherent probabilities of the transaction, I think it must be regarded as established that the complainant stated, while the description was in course of preparation, that the line in controversy should run from a point near a dead chestnut tree in the woods to the cherry tree, and that the error in the description resulted from the use of a word,

the force of which, in that connection, none of the parties understood or appreciated at the time they used it.

That the description, in the particular indicated, does not conform to the understanding of the parties, I think is proved by the conduct of the persons who made the bargain. The lessees made an attempt to survey the land demised about a month after the lease was executed. The complainant was present. As soon as he discovered that a survey according to the description would carry the eastern boundary beyond a point opposite the cherry tree, he disputed the accuracy of the description, and forbade them from proceeding further.

There is a stone fence standing on the complainant's land about two hundred and seventy feet beyond where, he says, the eastern boundary of the tract leased should be established. On the day that the survey was to be made, and before they commenced surveying, Mr. Bulgin applied to the complainant for an additional part of his farm; he offered, if the complainant would give him and his co-lessee the land up to the stone fence, to make him a present of $100, and to pay him seventy-five cents a ton on all ore mined. The complainant refused. Mr. Bulgin then offered the complainant's son $25 to persuade his father to accept his offer. Mr. Bulgin says, however, that this offer did not refer to the strip lying between the line as now claimed by the complainant and the stone fence, but to the whole residue of the complainant's farm, but in this he is contradicted so forcibly by his co-lessee that there can be no doubt his evidence must be discredited. Mr. Swayze says he was present when the offer was made, that the offer was for the land up to the stone fence, and that he at once told Mr. Bulgin he was foolish for making such an offer, for the eastern boundary of the tract described in the case extended to the stone fence, if not beyond it. Mr. Bulgin's conduct, in this respect, will bear but one interpretation. As already remarked, it is scarcely possible to believe that a sensible person would have concluded a bargain of this kind without a definite understanding respecting where the line of separation should run. His offer shows quite conclusively that this line had been agreed upon, and that the

line called for by the description differs materially from that agreed upon. A mistake, in the particular indicated, is, in my judgment, established by the requisite degree of proof to entitle the complainant to relief. A decree will be made decreeing that the second line in the description be corrected, by extending it along the timber land to a point opposite the cherry tree, so that the third line shall run from that point straight to the cherry tree.

The complainant is entitled to costs against the defendants Bulgin and Swayze. Originally the complainant may have been most in fault for the error, but, after the error was discovered, he applied to the defendants to correct it; he procured the consent of the assignee of the lease to its correction, and did all it was possible for him to do to avoid a resort to this court, but the two defendants named refused to do anything, and compelled the complainant to submit to the consequences of the error, or to seek judicial aid. The defendants should pay the costs of the litigation which their course has provoked.